UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| ALLAN STEVEN BOREN, ) | Case No.: 2:08-cv-00215-GMN-LRL |
| ) | |
| Plaintiff, ) | **ORDER** |
| vs. ) | |
| ) | |
| HARRAH'S ENTERTAINMENT, INC., ) | |
| et al., ) | |
| ) | |
| Defendants. ) | |

Before the Court is Defendants Harrah's Entertainment, Inc. and Rio Properties, Inc.'s ("Defendants") Motion for Summary Judgment (ECF No. 45), Plaintiff's Response (ECF No. 49), and Defendants' Reply (ECF No. 51). For the reasons that follow, the Court DENIES Defendants' Motion for Summary Judgment.[1]

### I.  FACTS AND PROCEDURAL HISTORY

Plaintiff Allan Boren was a high-stakes gambler who regularly gambled at various Harrah's properties including the Rio All Suite Hotel and Casino. On November 12, 1999, Plaintiff executed two markers--one for $25,000 and one for $75,000--at the Rio Casino. (Compl. 4 ¶ 16, ECF No. 1.) The markers were signed by Plaintiff but not dated at that time. (Spreitzer Decl. 1 ¶ 2, ECF No. 45-1.) Defendants explain that it is industry practice to wait until the casino is ready to redeem the markers before dating them. (*See* Amerine Decl., ECF No. 45-2.)

---

[1] However, Plaintiff is advised to better adhere in the future to the requirement in Local Rule 56-1 that a Response should include a "concise statement setting forth each fact material to the disposition of the motion which the party claims is or is not genuinely in issue, citing the particular portions of any pleading, affidavit, deposition, interrogatory, answer, admission, or other evidence upon which the party relies." Failure to adhere to this rule affects the ability of the court to render a timely ruling.

About one and a half months after executing the markers, on or about January 27, 2000, while Plaintiff was playing Pai Gow Poker at Harrah's New Orleans property, Plaintiff alleges that he discovered the dealer using only fifty-two cards, despite the requirement of fifty-three cards. (Compl. 6 ¶ 28, ECF No. 1.)  Upon realizing the dealer's error, Plaintiff demanded that his losses for that day be refunded.  (Compl. 6 ¶ 29, ECF No. 1.)  Harrah's declined to do so, and the relationship between Plaintiff and Harrah's quickly deteriorated.  Plaintiff threatened to file suit against Harrah's. (Compl. 6 ¶ 28, ECF No. 1).  Later that same year, Plaintiff was criminally charged in the Central District of California with, *inter alia*, aiding and abetting bank fraud; aiding and abetting the falsification of books and records; aiding and abetting mail fraud; aiding and abetting wire fraud; and aiding and abetting concealment money laundering.  (Mot. Summ. J., Ex. B, ECF No. 45-3.)  Plaintiff was placed in custody pending the resolution of those charges.

Plaintiff admits that he never wrote a check to repay these markers, (Mot. Summ. J., Ex. F 3:20–22, ECF No. 45-3), but contends that the money he owed under the markers was offset by the money owed to him under the high-stakes gambler incentive packages Defendants subsequently offered him, (*see id.*).  Plaintiff claims that Harrah's agreed to reimburse him for travel expenses to various Harrah's casinos and had excused the markers at issue as part of that reimbursement.  (*See* Boren Dep. 128–130, ECF No. 49-3.)  However, on or about August 30, 2000, while Plaintiff was in custody, Defendants attempted to redeem the markers from Plaintiff's bank account by writing "8-30-00" on the date line of the two markers Plaintiff had signed on November 12, 1999.  (*See* Mot. Summ. J., Ex. C, ECF No. 45.)   However, the markers could not be redeemed because there were insufficient funds in Plaintiff's bank account. (Spreitzer Decl. 1 ¶ 2, ECF No. 45-1.)

On October 23, 2000, Defendants sent Plaintiff a letter requesting that he pay the $100,000 value of the two markers and indicated that they would submit the markers to the Clark County District Attorney if he did not pay them. (*See* Resp., Ex. 8, ECF No. 49.)  The letter was sent to the address Defendants listed on the application for credit Plaintiff had submitted to Defendants back on July 3, 1999. (*See* Resp., Ex. 7, ECF No. 49.)  However, shortly thereafter, the letter was returned to Defendants by the Postal Service stamped "Attempted, Not Known." (*See* Resp., Ex. 8, ECF No. 49.)

On February 2, 2001, Defendants filed two bad check complaint forms--one for each outstanding marker--with the Clark County District Attorney's Bad Check Unit. (*See* Resp., Ex. 2, ECF No. 49.)  In the "Check Information" section of the form, Defendants wrote "11/29/99" on the blank line beneath the word "Date." (*Id.*)  Shortly thereafter, the District Attorney's Office began prosecuting Plaintiff under Nev. Rev. Stat. 205.130, which is Nevada's bad check statute. (*See* Resp., Ex. 4, ECF No. 49.)

Meanwhile, the unrelated criminal proceedings in California against Plaintiff resulted in a ninety (90) month sentence of imprisonment, as Plaintiff pled guilty to over two dozen criminal counts. (Mot. Summ. J., Ex. B, ECF No. 45.)  The bad check charges in Nevada remained pending against Plaintiff while he was in prison, but were then suddenly voluntarily dismissed by the prosecutor for undisclosed reasons shortly after Plaintiff was released. (Resp., Ex. 4, ECF No. 49.)  Court records of the proceeding state only "MOTION BY STATE TO DISMISS COMPLAINT, MOTION GRANTED," followed by "STATE ELECTS NOT TO PROCEED." (Resp., Ex. 4, ECF No. 49.)  Following the dismissal of the bad check charges in Nevada, Plaintiff filed this Complaint against Defendants in the United States District Court for the Central District of California on October 26, 2007.  Plaintiff then filed his First Amended Complaint on December 17, 2007, in which he alleged nine causes of action.  However, Defendants

filed a Motion to Dismiss for Improper Venue and, Alternatively, to Transfer Venue, which was granted, and the lawsuit was transferred to this District on February 13, 2008. Following the transfer, Plaintiff voluntarily dismissed, with prejudice, three of his causes of action. On November 4, 2009, Judge Jones dismissed all but one of Plaintiff's remaining causes of action for failure to file within the statute of limitations period. (Order, ECF No. 25.) Now, only Plaintiff's claim for malicious prosecution remains, which is the subject of the Motion for Summary Judgment currently before the Court.

In his malicious prosecution claim, Plaintiff essentially argues that he no longer owed Defendants the value of the markers, and that they submitted false information to the District Attorney's Bad Check Unit in bad faith in retaliation for him threatening to sue them and/or for revealing the dealer's dishonest conduct during the game of Pai Gow Poker. As a result of Defendants' actions, Plaintiff claims that he has suffered emotional distress, incurred attorney's fees, and been subjected to a longer prison sentence, as he believes the judge in the Central District of California took his pending bad check charges into account when sentencing him on the unrelated fraud convictions. Defendants, on the other hand, argue that this is basically a simple, routine case of two bounced checks, claiming Plaintiff signed both markers, accepted the benefit from them, but then failed to pay the debt they represented.

**II.    SUMMARY JUDGMENT STANDARD**

The Federal Rules of Civil Procedure provide for summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is

sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.* "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (citing *United States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir. 1999)).  A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

In determining summary judgment, a court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).  In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp.*, 477 U.S. at 323–24.  If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To establish the

existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).  However, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data.  *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

At the summary judgment stage, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial.  *See Anderson*, 477 U.S. at 249.  The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.  But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

### III.   DISCUSSION

In Nevada, the elements of a malicious prosecution claim are: (1) want of probable cause to initiate criminal proceedings; (2) malice; (3) termination of the criminal proceedings; and (4) damage.  *LaMantia v. Redisi*, 38 P.3d 877, 879 (Nev. 2002).  A malicious prosecution claim also requires that the defendant "initiated, procured the institution of, or actively participated in the continuation of a criminal proceeding against the plaintiff." *Id.* at 879–80.  Defendants contend that, as a matter of law, Plaintiff cannot prove any of these elements.

/ / /

### A. Initiation of Proceedings

Defendants rely on *Lester v. Buchanen*, 929 P.2d 910 (Nev. 1996) to support the illogical proposition that Defendants' simple act of filing two bad check complaints cannot be considered the sort of "institution" or "procurement" of criminal proceedings necessary to a claim of malicious prosecution. (*See* Mot. Summ. J. 9–10, ECF No. 45.) Defendants' attempt to summarize the Supreme Court's holding is wholly misleading. Defendants represent that, "in affirming, the Nevada Supreme Court held that the video store could not be held liable for malicious prosecution because all it did was provide information to the authorities." (Mot. Summ. J. 10:4–5, ECF No. 45). However, this summary omits a critical aspect of the Nevada Supreme Court's analysis, which was whether the video store believed its allegations to be true.

Such an aspect cannot be ignored under Nevada case law, nor can it be ignored under the Restatement (Second) of Torts. The final sentences of comment g to section 653 of the Restatement explain:

> If, however, the information is known by the giver to be false, an intelligent exercise of the [police] officer's discretion becomes impossible, and a prosecution upon it is procured by the person giving the false information. In order to charge a private person with responsibility for the initiation of proceedings, it must therefore appear that his desire to have the proceedings initiated, expressed by direction, request or pressure of any kind, was the determining factor in the official's decision to commence the prosecution, or that the information furnished by him upon which the official acted was known to be false.

Restatement (Second) of Torts § 653 cmt. g (1977). Thus, a defendant who files a complaint with the police or the district attorney's office that contains allegations he knows to be false can be viewed to have instituted proceedings against the party that is later charged based on that complaint. This is why the Court in *Lester* made certain to

clarify that it was undisputed that the video store had the good faith belief that the plaintiff did not return the video cassette, 929 P.2d at 913, and that the video store's "records still indicated that the movie . . . had not been returned," *id.* at 912.

In *Lester*, a video store filed a police report in which it stated that a particular video tape had not been returned. 929 P.2d at 911–12. Charges were then initiated based on the store's allegations; the plaintiff was arrested; and the charges were subsequently dropped. *Id*. The plaintiff then filed a lawsuit against the video store alleging malicious prosecution, but the trial court ultimately granted summary judgment in the video store's favor. *Id.* In affirming the trial court's decision, the Nevada Supreme Court concluded that the video store "cannot be held liable for commencing the criminal action because they merely reported information **they believed to be true** without directing, requesting, or pressuring the police to commence the criminal proceeding." *Id*. at 913 (emphasis added). The video store's undisputed belief in the truth of its allegations is what distinguishes *Lester* from the present case.

In this case, unlike in *Lester*, there does appear to exist a question of fact as to whether Defendants knew that the information contained in the bad check complaints was false. Although Mark Spreitzer, who oversaw collections at the Rio during the time period relevant to this case, attested that "the only reason these bad check complaints were prepared and submitted is because the Rio's records indicated that the money was owed and that the markers were returned for insufficient funds," (Spreitzer Decl. 1:17–19, ECF No. 45-1), Plaintiff has produced internal records from the Rio that, when viewed in the favorable light required at this stage in the proceeding, suggest the disputed markers were paid-in-full prior to Defendants filing the bad check complaints with the Clark County District Attorney's Office, (*see* Resp., Ex. 13, ECF No. 49). Specifically, entries "2" and "3" on the "Account Activity" form, which display the item numbers that

correspond to the numbering of the two markers, can be read to suggest that the markers were paid by check on September 14, 2000, over four months before Defendants filed the bad check complaints. (*See id.*)  Such evidence tends to call into doubt Mr. Spreitzer's testimony and could lead a reasonable trier of fact to find that Mr. Spreitzer had erroneously filed the complaints.  Thus, there is a question of fact that needs to be resolved at trial.  Although Defendants might argue that Plaintiff has admitted that he never wrote a check to pay off the markers and that it is therefore absurd to assume that the markers were actually paid by check (*see* Reply 2:17–19, ECF No. 51), it is actually possible that someone employed by Defendants merely updated the records to reflect the set-off Plaintiff claims to have received or that the money came from some other source, such as Plaintiff's money that was being held by the New Orleans property, (*see* Gore Dep. 34:6–35:23).[2]  Whether Defendants actually knew that the markers were already marked paid also goes to the existence of malice addressed below.  All of this will be resolved at trial.

### B.  Want of Probable Cause

In Nevada, want of probable cause is judged by an objective test.  *Jordan v. Bailey*, 944 P.2d 828, 834 (Nev. 1997).  "Under this test, it is for the court to decide whether a reasonable attorney would have considered the prior action legally tenable- ignoring any subjective factors such as the attorney's expertise and belief."  *Id.*  This "reasonable attorney" test is applied to both attorneys and non-attorneys.  *See, e.g., id.* (applying the "reasonable attorney" test to a defendant who is not identified as an

/ / /

---

[2] It is also possible that the markers were never paid off and that the check or checks referenced in entries 2 and 3 on the "Account Activity" screen was merely a *pro forma* invoice that was used for internal accounting purposes. However, Defendants have not yet demonstrated this, and a question of fact remains as to whether the debt was paid or offset on September 14, 2000.

attorney).³

In the bad check action allegedly initiated by Defendants, Plaintiff was charged with violating Nevada Revised Statute 205.130: Issuance of check or draft without sufficient money or credit. (Resp. 15:8–9, ECF No. 49.) This statute stipulates:

> Except as otherwise provided in this subsection and subsections 2 and 3, a person who willfully, with an intent to defraud, draws or passes a check or draft to obtain:
>    (a)   Money;
>    (b)   Delivery of other valuable property;
>    (c)   Services;
>    (d)   The use of property; or
>    (e)   Credit extended by any licensed gaming establishment, drawn upon any real or fictitious person, bank, firm, partnership, corporation or depository, when the person has insufficient money, property or credit with the drawee of the instrument to pay it in full upon presentation, is guilty of a misdemeanor. If that instrument, or a series of instruments passed in the State during a period of 90 days, is in the amount of $250 or more, the person is guilty of a category D felony and shall be punished as provided in NRS 193.130. In addition to any other penalty, the court shall order the person to pay restitution.

Nev. Rev. Stat. 205.130. In order to prevail on his claim, Plaintiff must demonstrate that a reasonable attorney would not have considered an action against him arising under this statute to be legally tenable. Plaintiff's primary contention seems to be that he did not have the requisite intent to defraud at the time he signed the markers. (Resp. 14–20, ECF No. 49.) Defendants do not explicitly contest this, but they do argue facts that seem to implicate Nevada Revised Statute 205.132, which allows the Court to presume an intent to defraud if "[p]ayment of the instrument is refused by the drawee when it is presented in the usual course of business, unless within 5 days after receiving notice of this fact

---

³ Defendants' argument that "[t]he caselaw concerning want of probable cause employs language regarding an 'attorney . . . institute[ing] [sic] an action' . . . because cases like the instant one, in which a non-attorney merely provided the prosecuting officers with information, all fail as a matter of law for failure to satisfy the 'commencement of a criminal action' element and therefore it is not necessary to reach this element," (Mot. Summ. J. 11 n.5, ECF No. 45), is undermined by *Jordan*, a case that they cite in their own motion.

from the drawee or the holder, the drawer pays the holder of the instrument the full amount due plus any handling charges." However, this is a rebuttable presumption, and, based on the evidence before the Court, there does appear to be a question of fact as to whether a reasonable attorney would believe that Plaintiff had the intent to defraud when he executed the markers. As Mark Gore--a casino host at the Rio--testified at his deposition, Plaintiff returned to Defendants' properties a few times in the months after he executed the markers and posted $1,000,000 in front money on two occasions. (Gore Dep. 32:2–20, ECF No. 49-2.) These are not normally the activities of someone who has just attempted to defraud a casino of $100,000, nor does it seem typical that a casino would wait nearly a year before trying to redeem a gambler's markers.[4] A question of fact remains as to whether a reasonable attorney would have believed that Plaintiff had intent to defraud, and, therefore, whether a reasonable attorney would have believed that the bad check charges were legally tenable.

### C.    Malice

Malice may be inferred from proof of want of probable cause. *Rashidi v. Albright*, 818 F. Supp. 1354, 1360 (D. Nev. 1993) (citing *Miller v. Schnitzer*, 371 P.2d 824 (Nev. 1962)). An issue of fact exists as to whether Defendants were aware that their own records had already marked the Plaintiff's two markers as having been paid prior to Defendants providing the Bad Check/Marker Complaint Form to the Clark County District Attorney's Office. However, in addition to this, Plaintiff also contends that the

---

[4] In *Nguyen v. State*, 14 P.3d 515, 516 (Nev. 2000), a representative of Harrah's testified that Harrah's normally deposited markers thirty-seven days after they were executed, though the representative allowed that some casinos would wait up to ninety days before cashing the markers. The Court recognizes that Harrah's and its subsidiaries might not follow the same policies and that the policies may have changed since the 1995–1996 time period the representative was describing, but the nearly ten-month period between when Plaintiff executed the marker and when Defendants tried to deposit it does cast some doubt over whether the presumption contained in Nev. Rev. Stat. 205.132 is applicable in this case. It is far easier to presume bad faith when a marker bounces after it has been held for only thirty-seven days than when it bounces after ten-months, particularly when the drawer had incurred attorney's fees in the interim.

prosecution was sought by Defendants in retaliation after he threatened to file a lawsuit against them upon discovery that their Pai Gow poker dealer used only 52 cards instead of 53.  If Plaintiff successfully establishes his claim at trial, this could certainly be sufficient to demonstrate the required element of malice.  Plaintiff's standard of proof for purposes of this motion for summary judgment is met by the notations in Defendants' own records revealing their knowledge of a possible future lawsuit against Harrah's New Orleans property.  Specifically, Defendants' records from March 16, 2001 note "CHAD SHOWS CLD. SZ CUS IS IN PROCESS OF FILING A LAW SUIT AGAINST N.O. SZ HE IS CLR, HOWEVER THEY HAVE 200K IN F/M THAT THEY WERE TOLD BY LEGAL NOT TO RELEASE TO HIM UNTIL ALL PENDING LITIAGATION [sic] I [sic] RESOLVED." (Resp., Ex. 9, ECF No. 49.) Thus, a question of material fact remains as to whether Defendants lacked probable cause to file the bad check complaint and acted maliciously, and a trial is necessary.

### D. Termination of the Criminal Proceedings

Defendants argue that, as a matter of law, this Court should rule in their favor because "Boren's discovery responses identify no admissible evidence in support of his allegation that the charges were dismissed on their merits." (Mot. Summ. J. 14:7–9, ECF No. 45.) Defendants again blatantly misrepresent the relevant case law to this Court . As another Court in this district has previously ruled, a plaintiff can survive a motion for summary judgment on a malicious prosecution claim by merely showing that the underlying litigation was voluntarily dismissed, *see Abbott v. United Venture Capital, Inc.*, 718 F. Supp. 828, 834 (D. Nev. 1989), which Plaintiff has done here, *see* (Resp., Ex. 4, ECF No. 49). Additionally, if, at the summary judgment stage, the defendants claim that the termination of criminal proceedings was not favorable to the plaintiff, then it is the defendants who shall "bear the burden of establishing that [the] favorable dismissal of

[the plaintiff] was not a favorable termination." *Abbott*, 718 F. Supp. at 834.  Therefore, Defendants' claim that they bear no burden of making such a showing is erroneous and if Defendants have not investigated this issue during discovery, their failure to provide the required evidence may well prove to be fatal.

### E.  Damage

Defendants contend that Plaintiff has failed to provide adequate evidence that his sentence of imprisonment was lengthened due to the bad check charges pending in Nevada.  (*See* Mot. Summ. J. 12:17–13:16, ECF No. 45.)  However, this is insufficient to demonstrate that Plaintiff will be unable to fulfill the damages element of a malicious prosecution claim, because Defendants' argument attacks only one of the three manners in which Plaintiff claims to have been damaged.  In his Complaint, Plaintiff alleges that, due to Defendants' actions, "the State of Nevada filed criminal charges against PLAINTIFF, for which PLAINTIFF was forced to suffer, among other injuries, an extended prison sentence, severe emotional distress and attorney's fees thus causing PLAINTIFF damages in an amount according to proof at trial." (Compl. 12 ¶ 92, ECF No. 1.)  It is only the first injury in that list--"an extended prison sentence"--that Defendants assail in their motion.  Although Defendants also address Plaintiff's emotional distress, they only do so with regard the emotional distress resulting from the prison sentence--they do not address whether Plaintiff will be unable to prove other emotional distress unrelated to the extended prison sentence but related to Defendants' actions.  The Complaint does not merely allege that Plaintiff suffered emotional distress as a result of a lengthened prison sentence; rather, it alleges that Plaintiff suffered, *inter alia*, emotional distress as a result of the charges brought by Defendants.  This is far broader than Defendants' portrayal of Plaintiff's position, and allows for the possibility that Plaintiff might show he suffered emotional distress wholly unrelated to his

imprisonment. In order to prevail on its contention that Plaintiff cannot prove damage, Defendants must demonstrate that Plaintiff will not be able to prove that sort of emotional damage as well. Defendants have failed to do so.

### IV. CONCLUSION

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment (ECF No. 45) is DENIED.

DATED this 19th day of October, 2010.

_____
Gloria M. Navarro
United States District Judge