**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

ALLAN STEVEN BOREN,

Plaintiff,

vs.

HARRAH'S ENTERTAINMENT, INC., et al.,

Defendants.

Case No.: 2:08-cv-00215-GMN-LRL

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The above-captioned case is a malicious prosecution action initially filed by Plaintiff Allen Boren against Defendants Mark Spreitzer, Harrah's Entertainment, Inc, and Rio Properties, Inc ("Rio"). Rio is the only remaining Defendant. Plaintiff, a former high-stakes gambler, contends that Defendant Rio maliciously initiated bad check charges against him in the Las Vegas Township Justice Court, thereby causing him to suffer damages. The matter was tried before the Court sitting without a jury on November 2–5, 2010. Following the close of Plaintiff's case, Defendant Rio made a Motion for Judgment on Partial Findings pursuant to Federal Rule of Civil Procedure 52(c). The Court granted that motion and issued a preliminary oral Order on November 5, 2010. This document constitutes the Court's final Order.

**FINDINGS OF FACT**

Based on the testimony and exhibits received at trial, and upon the stipulations of the parties, the Court makes the following findings of fact as required by Fed. R. Civ. P. 52(a):

1. Plaintiff was a high-stakes gambler. One of Rio's Vice Presidents, Mark

Gore, befriended Plaintiff in an effort to persuade him to gamble at the Rio.

2. At all times relevant to this proceeding, the Rio was in the process of being purchased by or had been purchased by Harrah's Entertainment, Inc.

3. A Rio employee completed a Credit Application for Plaintiff which listed Plaintiff's address as 8865 Canoga Ave., Canoga Park, CA 91304 and Plaintiff's bank as Sanwa Bank. Plaintiff signed this Credit Application in the presence of Mark Gore, a Vice President at the Rio.

4. On November 12, 1999, Plaintiff signed two markers for $25,000 and $75,000 respectively (the "Markers"), at the Rio All-Suite Hotel & Casino and received $100,000 in chips. Plaintiff proceeded to gamble with those chips. The Rio did not date the Markers on the date of this transaction but instead kept track of this date--November 12, 1999--separately and did not date the Markers until shortly before they were submitted to Plaintiff's account at Sanwa Bank. The Rio ultimately dated the Markers "August 30, 2000" which was not the date of the transaction but the date they were deposited for payment. As indicated by Rio's expert witness, Dennis Amerine, a former member of the Nevada State Gaming Control Board, this dating practice was fully in accord with the custom and practice in the casino industry at the time.

5. One of the two markers was secured by a $75,000 check drawn by Plaintiff payable to Rio; however, Plaintiff gave the Rio instructions not to cash the check. The Rio never deposited/cashed that check and the current location of that check remains unknown.

6. Plaintiff never repaid the $100,000 owed on the Markers, nor did he demonstrate that any contract, written or oral, existed which extinguished the debt.

7. Rio VP Mark Gore asked Plaintiff to pay the Markers on several occasions, and each time Plaintiff promised that he would pay the Markers in the immediate future,

but he never actually paid them.

8. On several occasions after November 12, 1999, Plaintiff provided the Rio with "front money" that far exceeded the amount he owed Rio under the November 12th markers. This front money was essentially a check provided by Plaintiff to the Rio as collateral for the amounts Plaintiff promised to gamble. However, based upon Plaintiff's representations that he would pay the November 1999 markers in the near future as well as the Rio's desire to continue to keep Plaintiff as a customer, the Rio never deducted the $100,000 Plaintiff owed from any subsequent front money provided to the Rio by Plaintiff.

9. On the last weekend of January, 2000, Rio VP Mark Gore arranged for Plaintiff and his friends to be flown to New Orleans to gamble at a different casino also managed by Harrah's. Plaintiff posted $1,000,000 as front money on that visit via a cashier's check provided to him by his neighbor. A written contract with the New Orleans casino provided that Plaintiff would receive travel reimbursements and guaranteed cash back discounts based upon a percentage of his gambling losses as well as other perks. While playing Pai Gow poker in New Orleans, Plaintiff lost over $700,000 of his front money. Around that same time, the New Orleans casino claimed to have received a call from Plaintiff's neighbor's bank, in which the bank indicated that someone purporting to be Plaintiff had called the bank and indicated that the $1,000,000 cashier's check had been lost on Bourbon Street. Because the staff of the casino was actually holding the cashier's check and knew that it could not contemporaneously be lost on Bourbon Street, the casino's management asked Plaintiff to leave the gambling table and questioned him in a private room. Around this same time, Plaintiff claimed that the dealer in the Pai Gow Poker game had cheated him by playing with only fifty-two instead of the required fifty-three cards. Plaintiff requested that the violation be reported to

gaming investigators who responded immediately to the gaming table to inspect the deck of cards. Thereafter, Plaintiff demanded a refund of all his losses. Following this exchange, Rio VP Mark Gore escorted Plaintiff and his friends to the Super Bowl game in the Rio jet, then back to Las Vegas where Plaintiff boarded the private plane he had chartered and flew back to his California residence. During the flights, Plaintiff mentioned filing a lawsuit against the New Orleans casino because Plaintiff never received a refund of his losses ($700,000) nor the balance ($300,000) remaining on the cashier's check. Additionally, Plaintiff never received any of the other reimbursements and loss percentages mentioned in his written contract with the New Orleans casino.

10. However, as late as May of 2000, Plaintiff still admitted to owing the Rio the value of the markers.

11. In the summer of 2000, Plaintiff was arrested on separate federal criminal fraud charges unrelated to the events in this instant action.

12. Thereafter, the Rio dated the Markers August 30, 2000, and submitted them for payment from the Sanwa Bank account listed on Plaintiff's credit application. The markers were returned unpaid due to insufficient funds.

13. In mid-October, 2000, the Rio sent a letter to Plaintiff requesting repayment of the Markers via certified mail, but incorrectly listed his address as 8865 Canoga ***Park***, Canoga Park, CA 91304 (instead of Canoga ***Avenue***). The letter was returned with a stamped marking on it that indicated "Attempted, Not known." The Rio did not ever attempt to resend the letter to the corrected version of this address nor to either of the other two addresses it possessed for Plaintiff including the Malibu home where Plaintiff was currently residing.

14. Despite having visited Plaintiff at his Malibu home, Rio VP Mark Gore had no personal knowledge of Plaintiff's actual residential address in California because he

had been chauffeured to Plaintiff's home via limousine. Mr. Gore's personal assistant--Melissa--or his wife may have possessed Plaintiff's actual current address as they sent Plaintiff Christmas cards and other special event correspondence, but Mr. Gore did not even recall the name of the town where Plaintiff lived.

15. On January 31, 2001, the Rio submitted two bad check complaints--one for each of the outstanding markers--to the Clark County District Attorney's Office. As indicated by defense expert Dennis Amerine, Rio's practice of submitting markers drawn on underfunded accounts for criminal prosecution after a letter requesting repayment sent to the address provided by the drawer had gone unanswered, was in accord with the custom and practice in the casino industry at the time.

16. Upon receipt of the two bad check complaints submitted by the Rio for prosecution, the Clark County District Attorney's Office sent notices of the action to all three of the addresses Rio provided for Plaintiff. Plaintiff failed to respond. On June 5, 2001, the Clark County District Attorney's Office filed formal criminal charges in the Las Vegas Township Justice Court against Plaintiff based upon the bad check (unpaid marker) complaints. Plaintiff failed to appear in court and a Bench Warrant was issued. Six and a half years later, the Nevada case was ultimately closed on February 1, 2007 when the Clark County District Attorney's Office voluntarily dismissed the charges. This dismissal occurred fewer than seventy-two (72) hours after Plaintiff called Rio's General Counsel to discuss the pending bad check charges.

17. Plaintiff's malicious prosecution claim against Rio arises from the Nevada criminal bad check/unpaid markers case. Plaintiff testified that the prosecution was sought in bad faith without probable cause and he suffered injuries/damages because the pending Nevada case detrimentally affected several aspects of his federal criminal fraud case in California, including his pretrial custody status, the length of his sentence and his

prison location designation which further resulted in other deprivations. Plaintiff alleged his visitation with his girlfriend and children was limited and he was deprived of the opportunity to participate in rehabilitative programs which, if successfully completed, would have shortened the length and conditions of his prison sentence.

18. On April 30, 2004, before the Nevada case was dismissed and while the Bench Warrant was still pending, Plaintiff was sentenced to 90 months in federal prison in the unrelated Central District of California criminal fraud case. Some portions of that case were sealed, including the transcript of the Sentencing Hearing. Plaintiff failed to provide evidence at trial to support his claim that the U.S. District Court Judge considered the pending Nevada bad check charges when determining Plaintiff's federal sentence.

19. Additionally, the Bureau of Prisons placed Plaintiff at Terminal Island Prison in California, rather than the Nellis Work Camp in Nevada, despite the sentencing judge granting Plaintiff's request and affirmatively recommending the Nellis designation to the B.O.P. However, Plaintiff failed to provide evidence at trial that Plaintiff's outstanding Nevada Bench Warrant caused the Bureau of Prisons to place him at Terminal Island rather than the Nellis Work Camp.

20. Plaintiff also alleges money damages as the result of several thousands of dollars in fees paid to attorneys to represent him in the Nevada bad check case. He or his family first retained attorney Louis Palazzo to represent him for $25,000. Later, attorney Gregory Cortese was hired and his fees related to that representation totaled $3,000.00.

21. Finally, attorney Brian Fisher was also hired to represent Plaintiff in the Nevada bad check case. Fisher's fees and costs related to that representation totaled $5,132.87.

///

**CONCLUSIONS OF LAW**

In accordance with Fed. R. Civ. P. 52(a), the Court reaches the following conclusions of law:

1. The Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332.

2. In Nevada, the elements of a malicious prosecution claim are: (1) want of probable cause to initiate criminal proceedings; (2) malice; (3) termination of the criminal proceedings; and (4) damage. *LaMantia v. Redisi*, 38 P.3d 877, 879 (Nev. 2002). A malicious prosecution claim also requires that the defendant "initiated, procured the institution of, or actively participated in the continuation of a criminal proceeding against the plaintiff." *Id.* at 879–80.

3. In Nevada, want of probable cause is judged by an objective test. *Jordan v. Bailey*, 944 P.2d 828, 834 (Nev. 1997). "Under this test, it is for the court to decide whether a reasonable attorney would have considered the prior action legally tenable-ignoring any subjective factors such as the attorney's expertise and belief." *Id.* Only when a reasonable attorney would find that the action was completely without merit can a court authorize a malicious prosecution action to proceed. *Rashidi v. Albright*, 818 F. Supp. 1354, 1359 (D. Nev. 1993). This "reasonable attorney" test is applied to both attorneys and non-attorneys. *See, e.g., Jordan*, 944 P.2d at 834. (applying the "reasonable attorney" test to a defendant who is not identified as an attorney).

a. Plaintiff was charged with violating Nevada Revised Statute 205.130: Issuance of Check or Draft without Sufficient Money or Credit. This statute reads as follows:

> Except as otherwise provided in this subsection and subsections 2 and 3, a person who willfully, with an intent to defraud, draws or passes a check or draft to obtain:

> (a) Money;
> (b) Delivery of other valuable property;
> (c) Services;
> (d) The use of property; or
> (e) Credit extended by any licensed gaming establishment, drawn upon any real or fictitious person, bank, firm, partnership, corporation or depository, when the person has insufficient money, property or credit with the drawee of the instrument to pay it in full upon presentation, is guilty of a misdemeanor. If that instrument, or a series of instruments passed in the State during a period of 90 days, is in the amount of $250 or more, the person is guilty of a category D felony and shall be punished as provided in NRS 193.130. In addition to any other penalty, the court shall order the person to pay restitution.

b. Plaintiff contends that there could not have been probable cause to file bad check complaints or the resultant bad check charges against him because any debt he owed Defendant had been extinguished by a series of agreements between the parties. However, Plaintiff failed to produce these agreements or to prove by a preponderance of the evidence that any agreements (1) existed between the Rio and him, and (2) extinguished the $100,000 he owed on the markers. Without making such a showing, Plaintiff did not prevail on his claim that there was a lack of probable cause. While Plaintiff did produce his written agreements with the New Orleans casino which were executed with the assistance of Rio VP Mark Gore, thus raising a material issue of fact sufficient to survive dismissal via summary judgment, Plaintiff failed to provide evidence that the Rio was a party to the New Orleans agreement or evidence of any similar agreements directly with the Rio casino. After the Super Bowl trip, Plaintiff continued to admit, as late as May of 2000, to owing the value of the markers to the Rio.

c. Thus, taking the evidence presented into account, this Court finds that Plaintiff failed to prove want of probable cause by a preponderance of the evidence because he did not demonstrate that a reasonable attorney would have considered an action against him arising under Nev. Rev. Stat. 205.130 to be completely without merit. The fact that the Markers were returned for insufficient funds and that Plaintiff admitted he never directly paid off the markers, combined with Plaintiff's inability to produce any instrument extinguishing the Markers, could easily be viewed by a reasonable attorney as sufficient. A reasonable attorney could then surmise an intent to defraud at the time the Markers were signed from Plaintiffs' repeated representations to Mark Gore that he would pay off the Markers, followed by his repeated failures to pay off the Markers. The timing of Plaintiff's claim that he was being cheated by the Pai Gow Poker dealer in the New Orleans casino when he came under scrutiny for reporting to the bank that the cashier's check had been lost is suspicious and further weakens Plaintiff's position. A reasonable attorney could undoubtedly believe that Plaintiff's signing of the markers was just another instance of him--in Mark Gore's words--"taking a shot" that his dishonesty would not be caught. Plaintiff failed to produce sufficient evidence to demonstrate that a reasonable attorney would have found such conclusions--and the probable cause that arises from them--to be completely without merit. Perhaps even more notable is the fact that Plaintiff never raised this particular allegation--that his $100,000 debt had been extinguished by subsequent agreements with Defendant--as a defense in his initial Motion to Dismiss the criminal bad check case. Only years later, in this civil action, was this contention raised.

d. Accordingly, the lack of probable cause element was not proven,

and Plaintiff's claim for malicious prosecution fails.

4. Even if Plaintiff had not failed to prove want of probable cause, his claim would still be unsuccessful because he did not prove malice by a preponderance of the evidence. In Nevada, malice may be inferred from proof of want of probable cause, *see Rashidi*, 818 F. Supp. at 1360, but it need not be. On the other hand, the presence of probable cause requires the conclusion that malice is nonexistent. *Id.* The Nevada Supreme Court has never positively defined "malice" in the context of a claim for malicious prosecution, but the Restatement (Second) of Torts has. This Court finds, as did the court in *Abbott v. United Venture Capital, Inc.*, 718 F. Supp. 828, 832 (D. Nev. 1989) under similar circumstances, that the Nevada Supreme Court would look to the Restatement (Second) for guidance if confronted with such a lawsuit and adopts the definition of malice contained in the Restatement. The Restatement specifies that, in order to find malice, the underlying proceedings must have been "initiated primarily for a purpose other than that of bringing an offender to justice." Restatement (Second) of Torts § 668 (1977).

a. Plaintiff contends that Defendant initiated the underlying bad check charges against him out of malice originating from Plaintiff asking the gaming commissioners to investigate the Pai Gow Poker game at the New Orleans casino managed by Harrah's. However, not only did Plaintiff fail to provide evidence that his actions actually angered the New Orleans casino or its employees, he failed to prove, by a preponderance of the evidence, a causal link between that alleged anger and the actions of the Rio--a separate casino--nearly a year later. There was no showing that the Rio submitted the bad check complaints as some sort of retribution for Plaintiff's allegations against the dealer in New Orleans. Further, Plaintiff failed to show that the only evidence produced in support of the

malice claim--that the certified letter demanding repayment was sent to 8865 Canoga **Park** instead of 8865 Canoga **Ave**., and never sent to any of Plaintiff's other addresses--should more appropriately be viewed as a sign of malice than an example of innocuous ineptitude. This Court finds that the address error was more likely merely an administrative failure, not an indicator of malice. Nor was the fact that an agent for Defendant dated the Markers a different date than the date on which they were issued an indicator of malice, as this Court found credible defense expert's testimony that this practice was consistent with industry standards at the time. Without more, Plaintiff failed to show that the bad check proceedings were initiated for some reason other than to redeem an unpaid debt. The fact that Plaintiff admits he never affirmatively paid the debt and his failure to establish that the $100,000 debt was extinguished further weigh against a finding of malice: it is not malicious for an entity to attempt to collect a debt that it reasonably believes it is owed.

b. Accordingly, the malice element was not proven, and Plaintiff's claim for malicious prosecution fails.

5. Because Plaintiff has failed to establish two of the essential elements of his malicious prosecution claim, the Court will refrain from addressing the other elements of this cause of action.

## CONCLUSION

IT IS THEREFORE ORDERED that judgment be entered in favor of Defendant Rio and against Plaintiff Boren.

DATED this 30th day of November, 2010.

GLORIA M. NAVARRO
UNITED STATES DISTRICT JUDGE